# Appendix II

**Affidavit of Danial Williams:**

I, Danial Williams, hereby affirm under the penalty of perjury that the following information is true to the best of my knowledge, information and belief:

1.  I am over the age of eighteen, competent to testify and have personal knowledge of the matters sworn to herein.

2.  I come from a family with a tradition of military service and I decided in high school that I wanted to follow that tradition by enlisting in the Navy. In April 1991, two months before I graduated from Owosso High School in Owosso, Michigan, I pre-enrolled in the United States Navy. I left for boot camp right after my high school graduation, served four years, and reenlisted for another four years in 1995; I planned to make a career in the Navy.

3.  In 1994, I began dating Nicole Mathewson while I was stationed at the Norfolk Naval Base in Norfolk, Virginia. Nicole and I quickly fell in love and later in 1994, we became engaged. We moved in to an apartment together at 41st and Bentley Street in Norfolk. In January 1997, after I returned from a six-month cruise on the USS Saipan, Nicole and I rented a two bedroom apartment in the Bayshore Garden Apartments, just outside of the gate to the Norfolk Naval Base. One of my shipmates from the USS Saipan, Joseph Dick, shared the apartment with Nicole and me.

4.  For almost all of the time that we lived in the Bayshore Garden apartment, we did not have a home phone. Instead, I had a pager that Nicole, my family, and others used to reach me. Joe Dick arranged for a home phone in our apartment beginning sometime in early July 1997, but I do not recall the specific date.

5.  Over the next few months, Nicole and I started seriously discussing picking a date to get married. Sometime in the late spring of 1997, Nicole missed her period and we thought

that she was pregnant. Nicole and I were excited about the possibility of having a baby. In early June 1997, we traveled to Owosso, Michigan, where I grew up, to attend the high school graduation for my younger brother, Chris. While in Michigan, we shared our news about Nicole's pregnancy and our decision to set a date for our wedding with my parents.

6.     Shortly after Nicole and I returned to Norfolk, Nicole began bleeding from her vagina while I was at work. Nicole paged me at the Naval Base and her friend, Regina, took her to the hospital. As soon as I got the news, I went to the hospital to meet Nicole and Regina. We thought that Nicole was having a miscarriage, but after the doctors did some tests, they told us that Nicole was never pregnant but, instead, she had a mass on her ovary. After a biopsy showed that Nicole had cancer, the doctors said they would have to operate to remove the cancer.

7.     Nicole and I realized that her diagnosis was very serious and we decided not to wait any longer to get married. On June 27, 1997, Nicole and I were married at the Norfolk Circuit Court. I requested and was granted two weeks of leave from work to help Nicole after her surgery. On July 1, 1997, Nicole entered the hospital for surgery to remove her cancerous tumor and to have a hysterectomy. During the time Nicole was in the hospital, I spent most every day with her, usually arriving at about 8 a.m. and leaving around 9 p.m. Nicole's doctors told us that the surgery went well and that they believed that they had gotten all of the cancer. They said Nicole would have to start chemotherapy treatments after she recovered from the surgery.

8.     On Saturday, July 5, 1997, I drove from the hospital to a trailer park outside Norfolk to meet my parents, who had driven with their trailer to visit us. Because they had

been on the road for several weeks, I told my parents about Nicole's illness, our marriage, and her surgery. Nicole was to be released from the hospital the next day, and I invited my parents to come to our apartment to see Nicole and to have dinner with us.

9. On Sunday, July 6, 1997, I brought Nicole home from the hospital and my parents came over later. I made dinner and we spent most of the afternoon with my parents. We planned to meet my parents again on Tuesday afternoon to go out to dinner. However, on Monday afternoon, July 7th, I received a message from my older sister, Stacey, that one of my father's relatives had died. Nicole and I drove out to the campground to tell my parents the news. We stayed at the campground with my parents until almost dark and then drove back to our apartment, stopping along the way at a Cracker Barrel restaurant for dinner. Nicole and I went to bed at about 10 p.m.

10. The next morning, Tuesday, July 8, 1997, I woke up at around 9 a.m. and Nicole and I had breakfast. We then went to the Social Security office so that Nicole could formally change her last name to Williams. We ran a few other errands and then went home to our apartment to meet my parents at around 3 p.m., but neither Nicole or I had a chance to eat lunch that day. My parents were waiting for us in the apartment parking lot when we arrived. They had bought Nicole and me some wedding presents and my father and I put together a table for the new microwave my parents had bought us.

11. A little before 5 p.m., just before we were getting ready to go out to dinner, my neighbor William Bosko banged on our apartment door screaming that Michelle had been murdered. William Bosko was frantic and asked me to call 911, which I did. I then followed William Bosko into his apartment and into his bedroom. I saw Michelle lying on her back on the bedroom floor, wearing a black t-shirt bunched up around her chest. Michelle was naked

3

from the waist down and her husband and I covered her lower body with a blanket that was lying on the floor next to her.

12.     When the police and an ambulance arrived, I went back to my apartment. Shortly after that, a police officer came to our apartment and asked Nicole and me some questions about how well we knew Michelle and what happened this afternoon when our neighbor banged on our door.

13.     Nicole, my parents and I were just getting ready to leave for dinner when a police detective asked me to come to the police station to answer some more questions about Michelle. The detective was very casual about his request and said that I could drive my truck to the station. I thought it was the right thing to do to help the police since I was raised to respect and obey police officers, so I told my family that I would meet them at dinner and I drove to the police station, following an officer.

14.     I got to the police station at about 6 p.m. and sat in the detectives' squad room until 8 p.m., when a detective took me into an interrogation room. The room was small and had no windows. I sat in a chair at the far end of the room with my back to a wall and facing the only door. The only other furniture in the room was a table and two chairs. Detective Maureen Evans and Detective Scott Halverson began interviewing me. Detective Evans read me my rights and asked me if I would talk with them without a lawyer. I had nothing to hide and had done nothing wrong and never thought of asking for a lawyer.

15.     The detectives asked me to tell them what I had done on Monday and Tuesday up until the time that William Bosko banged on my door. I told the police everything that I had done over the last two days and when I finished, they asked me to go over it again. At some point, Detective Evans told me that the police had a witness who had seen me coming out of

4

Michelle Bosko's apartment late Monday night after she had last been seen alive. I told Detective Evans that the witness was either mistaken or lying because I had not been in Michelle's apartment on Monday night but instead had been home in bed with Nicole. Detective Evans told me she believed the witness and that I was not telling the truth. I told Detective Evans that I was telling the truth, that I was home with Nicole all night and that I would take a lie detector test to prove I was telling the truth.

16.   Detective Evans said they would give me a lie detector test. While I was waiting to take the lie detector test, Detective Evans and Detective Halverson asked me if I would agree to give the police samples of my blood and my hair. I knew I had nothing to be afraid of so I agreed to do whatever the police asked of me. After waiting some more, another detective took me to a new room for a lie detector test. During the lie detector test, he asked me questions about whether I was involved in Michelle's murder. I truthfully told him that I was not involved in her murder. After the lie detector test, a paramedic came to take my blood and the police took hairs from my head, my pubic hairs, and the underwear I was wearing and they also swabbed my penis.

17.   After the lie detector test, Detective Evans and Detective Halverson put me back in the same interrogation room. Detective Evans told me that I had failed the lie detector test and that I was not being straight with the police. Detective Evans interrogated me for a long time. She kept insisting that I was not telling them the truth, that I was not leveling with them, and that I knew something about Michelle's murder. I tried to tell them that I did not know anything but she would not believe me. At one point, Detective Evans asked me if I knew about DNA evidence and how it could prove that someone committed a crime. She told me that they had found pubic hairs on or near Michelle's body and that the DNA tests would show

5

they were mine. She said it would be better if I told the police now what I had done to Michelle because it would look worse if I waited until the DNA tests came back and they showed I killed her.

18.     At one point, Detective Evans suggested that I might have blacked out or been sleep walking and not realized that I had killed Michelle. I continued to insist that I had nothing to do with Michelle's death. It was exhausting to keep being badgered by Detective Evans and to continually tell her that I did not hurt Michelle, but Detective Evans did not stop. I was very tired and I put my head down on the table many times during the night. Each time, Detective Evans or Detective Halverson told me to pick up my head. I told the detectives several times that I was worried about Nicole and asked if I could call her to see how she was doing. I had told them earlier in the evening that Nicole had just gotten out of the hospital after having surgery. Detective Evans accused me of lying about Nicole's cancer and said she did not even believe Nicole was sick, which made me very angry.

19.     Much of the time during the interrogation, Detective Evans was angry at me and sometimes she yelled at me. But other times, she was soft spoken and talked with me about how she could understand how bad I must feel about Michelle being dead.

20.     After what seemed like a very long time being questioned by Detective Evans, a new detective, Detective Ford, came in with Detective Halverson. Detective Ford put his chair right in front of my chair with no table in between us. He told me that he knew that I had killed Michelle. When I told him that I did not kill Michelle, Detective Ford told me that I was a liar. He told me that I was facing capital murder charges but that if I cooperated with the police and confessed, he would help me get a lesser charge. He put his hand up high on the wall next to me, showing me where capital murder charges were, and then lowered his hand and showed me

6

where the lesser charge was that he could help me with if I confessed. At times, Detective Ford got right in my face and yelled at me. He repeatedly poked me in my chest and told me that he knew I killed Michelle.

21.  I was exhausted and confused and the police had me questioning my own memory. I knew that I had told the police the truth when I said I had nothing to do with Michelle's death but the police told me they had a witness who saw me come out of Michelle's apartment, that I failed the lie detector test and that the blood and hairs they took from me would prove I was guilty. They also told me that I could have blacked out or was sleep walking. Detective Ford told me I was facing capital murder charges but that if I cooperated by confessing, he would help me and it would not be so bad for me. I felt that this was a promise from Detective Ford that he would help me get a lesser charge than capital murder if I confessed. I felt helpless and finally could not take it anymore. I do not know why I confessed to Detective Ford. I guess I could not take it anymore so I told him what he wanted to hear. Detective Ford told me that they needed to know details about what I did, so I made some of the details up and others were things that I saw when I went into the Bosko apartment with Billy Bosko while I was calling 911. I knew that what I was telling Detective Ford was not the truth but I just wanted the questioning to end.

22.  I told Detective Ford that I raped Michelle and that I hit her with a shoe. The detectives tape recorded my statement and later had me sign it. Later, Detective Halverson came in and asked me if it was possible that I grabbed Michelle by the neck and choked her, and I just agreed with his suggestion and said yes. Then Detective Evans came in later and she told me she had been at the autopsy. She told me that Michelle Bosko had been stabbed and demonstrated on her chest where Michelle was stabbed. She wanted me to say that I stabbed

7

Michelle multiple times with a knife in the chest, and she demonstrated by pounding on her chest three or four times over her heart. I told Detective Evans that if I stabbed her, I did not remember doing it. I said that because I wanted Detective Evans to leave me alone but when she did not leave me alone, I told her I stabbed Michelle in the chest, just like she showed me. Detective Evans then tape recorded me again and I signed that statement. Finally, the police left me alone.

23. I told my parents and Nicole the first time that I saw them at the jail after I was arrested that I did not kill Michelle. They asked me why I confessed and I told them that the detectives kept badgering me until I could not take it anymore. I met my lawyer, Danny Shipley, for the first time when I went to court for my arraignment. He came to see me in the courthouse lockup after court and told me that we could not talk there about what happened but that he would come to the jail to interview me. The first time that I spoke with him and my other lawyer, Robert Frank, about the case at the jail I told them that I did not have anything to do with Michelle's death and that I was home in bed with Nicole when the police said Michelle was murdered. I told them that my statement was a lie and that I confessed because the police wore me down during an interrogation that lasted for fourteen hours. Early on in my case, while Nicole was still alive, I told my lawyers that Nicole had ovarian cancer. I also told my lawyers that Nicole had said that someone had been committing assaults in our neighborhood around the time that Michelle Bosko was murdered and Nicole thought that whoever had committed those assaults might be the person who killed Michelle.

24. On November 2, 1997, my wife Nicole died. I was not allowed to attend her funeral, which tore me up inside. I now felt totally alone.

25. After Nicole died, my lawyers came to see me at the jail and told me that we would go to court on a motion to suppress my statements to the police. I was grieving for Nicole, who had just died days earlier. They asked me questions about my interrogation and I answered all of my lawyers' questions in detail. I told my lawyers that: (i) I was stressed out because of my wife's cancer surgery; (ii) during the interrogation, in the middle of the night, I told the detectives that I was tired and wanted to go home, but the detectives ignored my request to end the interrogation; (iii) the police told me that not confessing would make me look more guilty when the DNA came back in six weeks; (iv) Detective Ford told me I could be charged with capital murder but, if I confessed, he could get the charges "knocked down" or he could help me get a lesser charge, and Detective Ford repeated this for over an hour; (v) I felt physically intimidated by Detective Ford, who had me in a chair up against the wall and was sitting directly in front of me; and (vi) Detective Evans provided me with some details about the crime, including that Michelle was stabbed in the chest.

26. During this meeting, my lawyers did not tell me the questions they planned to ask me at the hearing when I testified, they did not prepare me for cross examination, and we did not practice my testimony.

27. Later in November 1997, I went to court for a motion to suppress my statements to the police. I testified about what happened during my interrogation, but the judge ruled that the Commonwealth could use my confession in court.

28. Sometime after that, Mr. Shipley and Mr. Frank told me that they had a plea offer for a life sentence instead of the death penalty. I told them that I did not want to plead guilty because I did not kill Michelle. At some point, Robert Frank said my name should be "Denial"

instead of "Danial" because I was in denial about what would happen to me if I went to trial. He told me that I would probably be sentenced to death.

29.     I told my lawyers that I wanted to get the DNA test results because the DNA would show I was innocent.

30.     One day, after Joseph Dick was charged, Danny Shipley came to the jail to see me. He asked me why I did not tell him that another sailor was involved in the crime with me because he could have used that to help me get a better plea offer. I told him "Mr. Shipley, how could I tell you that someone else was involved when I wasn't there?"

31.     In early 1998, my lawyers told me that a psychologist would conduct an evaluation of me for court. A while later, I met with the psychologist and truthfully answered all of his questions. I told the psychologist the same things that I had told my lawyers, including: (i) I am innocent of the crime and I was home in bed with my wife the night the murder occurred, but the police broke me down and got me to falsely confess; (ii) I was questioned for fourteen straight hours and had been worn down by the police interrogation; (iii) the police gave me a lie detector test, told me that I had failed, and said that my DNA would show that I was guilty; (iv) during the interrogation, the police provided me with details about the crime, and one detective demonstrated how the victim was stabbed on her own chest; and (v) I was so stressed out and confused by the police interrogation and was under such intense pressure to confess that the police almost got me to believe that I was involved.

32.     Sometime in 1998, my lawyers told me that the DNA tests showed that it was not my sperm that was found on Michelle but that the prosecutors were not going to drop the charges. I did not understand what was going on. I had been waiting for the DNA tests because I knew they would show that I did not kill Michelle. But the police kept arresting and charging

10

new people and saying that we were all involved in Michelle's death. Even after my lawyers told me about the DNA results, they still wanted me to plead guilty. But I told them that I would not plead guilty to a crime that I did not commit.

33. After Eric Wilson was arrested and charged with Michelle Bosko's murder, Danny Shipley came to see me at the jail. He told me about Eric's charges and asked me why I had not told him about Eric's involvement in the crime because he could have used that information to get me a better plea offer. But just as I had said when he asked me the same question when Joe Dick was arrested, I told Mr. Shipley that I could not tell him the names of anyone involved in the crime because I was not involved.

34. Late in 1998, my lawyers came to see me. They told me that Joseph Dick and Derek Tice were going to testify against me at trial. They said that because of my confession and the testimony of Joe and Derek, I was going to be convicted and probably would be sentenced to death. They told me that because very few death sentences are overturned on appeal, if the jury sentenced me to death, and they probably would sentence me to death, I would likely be executed. They told me that they could save my life if I agreed to plead guilty. They pushed me really hard to take the plea and put enormous pressure on me, and I finally gave in and agreed to plead guilty to a crime I did not commit. They told me that I would have to say in the plea that I committed the crime with Joe, Eric, Derek and three other men, Geoffrey Farris, Richard Pauley, and John Danser.

35. I did not want to plead guilty because I knew that I was not involved in any way in the attack on Michelle Bosko. However, I felt I had no choice. My alibi witness, my wife Nicole, who could help prove that I was home in bed with her the entire night that Michelle Bosko was murdered, had died. My lawyers only wanted me to plead guilty. They did not

11

want to go to trial, and they told me that if I went to trial, I would be convicted, and probably sentenced to death and executed.

36. After I plead guilty, my lawyers came back to the jail to tell me about a man named Omar Ballard who had confessed to raping and killing Michelle. They also told me that Omar Ballard's DNA matched the semen in Michelle and the blood under her fingernails. I told my lawyers that I wanted to take back my guilty plea and asked them to file a motion, which they did.

37. My lawyers never prepared me to testify before my hearing on the motion to withdraw my guilty plea, and they did not call me as a witness at the hearing in front of Judge Poston. If I had testified at the hearing, I would have told Judge Poston that: (i) I am innocent and I was not involved in any way in the rape and murder of Michelle Bosko; (ii) I was home in bed with my wife at the time that the crime occurred; (iii) my wife corroborated my alibi but she had died of ovarian cancer in November 1997; (iv) while I was held in jail, I told everyone who would listen from the very beginning that I was innocent, including my family, my lawyers, the court-ordered psychologist, and even the pre-sentence investigator who interviewed me after I pled guilty; (v) when Joe, Eric, and Derek confessed to this crime and claimed that I had been involved, I told my lawyers that I did not know why they were making those accusations because I was not involved at all; (vi) I did not want to plead guilty and I rejected at least two plea offers brought to me by my lawyers during 1998; (vii) in January 1999, my lawyers placed intense pressure on me to plead guilty, telling me that I would very likely be convicted because I had confessed and because Joe Dick and Derek Tice were going to testify against me, and that I probably would be sentenced to death if I did not plead guilty; (viii) although I am innocent and did not want to plead guilty, I felt I had no choice because my

alibi witness had died and my lawyers were not prepared to fight the charges; and (ix) I only pled guilty to avoid the death penalty.

38. When we went to court for the motion to withdraw my guilty plea, the judge would not let me take back my plea, and he sentenced me to two life sentences.

39. I was assigned a new lawyer, Cynthia Garris, for my appeal. After I lost my appeal, none of my lawyers told me that there was anything else I could do to try to overturn my conviction. None of my lawyers told me that I had a right to appeal my conviction to the Virginia Supreme Court and then to the United States Supreme Court, nor did they tell me that I had a right to file a petition for habeas corpus in the Circuit Court in Virginia or in the United States District Court. I was also never advised of these rights by any court.

40. I am innocent of all the charges for which I was convicted. I did not rape or kill Michelle Bosko and had nothing to do with her death. I loved my wife and would never have been unfaithful to her. More importantly, I would never and could never do the horrific things I was accused of and that I now know Omar Ballard committed.

January 27, 2010
Date

Danial Williams

_____
Notary Public

MALYNDA SCHADEL
NOTARY PUBLIC, STATE OF MI
COUNTY OF GENESEE
MY COMMISSION EXPIRES Jan 2, 2014
ACTING IN COUNTY OF Shiawassee