## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**DANIAL WILLIAMS,**

     Petitioner,

v.                                                                  Civil Action No. **3:09CV769**

**WILLIAM M. MUSE,**

     Respondent.

### MEMORANDUM OPINION

Danial Williams, a Virginia probationer, submitted this petition for a writ of habeas corpus under 28 U.S.C. § 2254. Williams challenges his convictions, following a guilty plea, for capital murder and rape. Respondent has moved to dismiss on the grounds that, *inter alia*, the statute of limitations applicable to federal habeas petitions bars Williams's petition and that Williams's claims are procedurally defaulted. Williams has responded. Williams asserts, *inter alia*, that his actual innocence allows the Court to address the merits of his claims. The Supreme Court recently concluded that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . [or] expiration of the statute of limitations." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). For the reasons set forth below, the Court will set the matter for an evidentiary hearing on Williams's assertion of actual innocence.

### I. Williams's Grounds for Habeas Relief

Because the nature of a petitioner's claims bears on what evidence the Court may consider as part of the actual innocence inquiry, it is appropriate to recite Williams's grounds for habeas relief prior to addressing his assertion of actual innocence. *See Cleveland v. Bradshaw*,

693 F.3d 626, 637 n.4 (6th Cir. 2012) (quoting *Gomez v. Jaimet*, 350 F.3d 673, 680 (7th Cir. 2003)). Williams demands relief upon the following grounds:[1]

Claim 1      Williams is actually innocent of the capital murder and rape of Michelle Bosko. (Am. § 2254 Pet. 77–78.)

Claim 2      Williams failed to receive the effective assistance of counsel.[2] Specifically:

> (a) Danial Williams's lawyers failed to make reasonable and necessary efforts to investigate the Commonwealth's evidence against him and to investigate and preserve evidence in support of defenses to the Commonwealth's charges.

> > (i) Danial Williams's lawyers failed to take any steps to preserve the testimony of his sole alibi witness, Nicole Williams, including by taking her deposition, which would have given the Commonwealth an opportunity to cross examine her thereby ensuring her testimony would be admissible at any subsequent trial.

> > (ii) Danial Williams's attorneys failed to conduct any factual investigation to support a defense that Danial Williams's confession was false and that another individual raped and murdered Michelle Bosko, even though his attorneys were aware of similar assaults committed in the area and even though they sought and received court approval for $1,000 to hire an investigator—funds they never used. Had Danial Williams's lawyers investigated his case early on in their representation, they would quickly have learned of Omar Ballard and could have requested that Ballard's DNA be compared to the DNA of the rapist and murderer, which would have revealed an exact match to the crime scene and autopsy samples from the Bosko murder.

> (b) Danial Williams's attorneys failed to properly prepare for and present evidence in support of his motion to suppress the inculpatory statement he gave to the police.

---

[1] The Court recites verbatim from the Amended § 2254 Petition (ECF No. 34) Williams's supporting grounds for each of his five claims for habeas relief.

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

(i) His attorneys failed to prepare Danial Williams to testify at the hearing on the motion to suppress his statements. They also failed to present substantial evidence, of which they were aware, about the coercive interrogation tactics that the police used during Danial Williams's interrogation that demonstrated that his will had been overborne and that his confession was involuntary.

(ii) Although they knew of [Detective Robert Glenn] Ford's background of obtaining false confessions and specifically his involvement in the notorious Lafayette Grill case, Danial Williams's lawyers never sought to introduce evidence of Ford's history at the motions hearing. They failed to call Ford, who was present and available to testify, as a witness at the hearing even though Ford was the key detective who extracted Danial's confession. His attorneys never requested court ordered funds to hire a defense psychiatric expert witness to determine, in support of an involuntary confession claim, whether Danial Williams's personality profile made him susceptible to succumbing to police pressure, such that he would falsely confess, and to corroborate his claim that his will was overborne by the police.

(iii) Danial Williams's lawyers failed to demonstrate at the suppression hearing that a key indicator that his false confession was involuntary was that it did not match the key details of the crime, but instead conflicted with the physical evidence and the autopsy evidence in every material respect. Danial Williams's lawyers failed to establish at the motions hearing that the only facts that Williams correctly described in his initial statement were things that he observed when he accompanied William Bosko into the apartment after calling 911 at William Bosko's request (specifically that Michelle Bosko was assaulted in her bedroom, that she had on a black t-shirt and no panties, and that she was lying on the bedroom floor with her arms over her head).

(c) Danial Williams's attorneys failed to develop defenses to the charges that were available to him and to properly prepare for trial.

(d) Danial Williams's attorneys did not believe and explore Williams's repeated, consistent, and corroborated claims that he was innocent. Instead, they concluded early on in their representation of him that he was guilty.

(e) Danial Williams's lawyers failed to prepare him to testify at the hearing on his motion to withdraw his guilty plea. They failed to call him as a witness at the hearing to testify that he was actually innocent of the charges, and to testify that he had maintained his innocence throughout their representation of him, even after he pled guilty to avoid execution.

(f) His appellate attorney failed to present reasonable arguments on appeal to demonstrate that it was an abuse of discretion and error for the trial court not to permit Danial Williams to withdraw his guilty plea and to press the numerous constitutional violations in the state proceedings.

(*Id.* at 79–81.)

Claim 3      Danial Williams's guilty plea was involuntary for a variety of reasons. Williams asserts that:

(a) As detailed above, Danial Williams's attorneys failed to investigate and preserve evidence, develop available defenses to the Commonwealth's charges, and take other reasonable and necessary efforts to prepare for trial despite his consistent and repeated claims that he was innocent of the charges.

(b) Danial Williams's attorneys placed enormous pressure on him to plead guilty. Over the course of the case, Robert Frank, one of his lawyers ridiculed him for his resistance to pleading guilty, saying that he should be named "Denial" because he was in denial about what would happen to him. His lawyers first pressed him to plead guilty in January 1998, before they knew the results of DNA tests that Williams insisted would exonerate him. When he refused to plead, his lawyers simultaneously requested a court-ordered competency evaluation of him, despite the fact that he was clearly competent, and sought his parents' support to pressure him to accept the plea offer. However, Williams rejected the plea offer. His lawyers' second attempt to persuade Williams to plead guilty came after April 30, 1998, when they learned of his exculpatory DNA results; Williams rejected the plea offer again on or about June 9, 1998. His attorneys' third attempt to persuade Williams to plead guilty occurred in January 1999, when his trial was only weeks away. Williams's lawyers described in the worst possible light their belief that Danial would likely be found guilty, sentenced to death, and executed if he went to trial.

(c) Without the possibility of challenging the Commonwealth's evidence against him because of his attorneys' inadequate preparation, Danial Williams believed that he had no choice but to accept a guilty plea to avoid the death penalty, even though he wanted to contest the Commonwealth's charges.

(*Id.* at 81–82.)

Claim 4      The Commonwealth engaged in a pattern of misconduct that violated Williams's right to due process.[3] Specifically:

---

[3] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

(a) The Commonwealth suppressed material, exculpatory, and favorable evidence that should have been disclosed to the defense in a timely manner, including:

> (i) Tamika Taylor's statement to the authorities that she was suspicious of Omar Ballard and he should be considered a prime suspect because he had a criminal past, he knew Michelle Bosko, he visited her at odd hours (despite being banned from the apartment complex), and he had committed violent assaults against other young women in the area.

> (ii) The DNA results it learned of on December 11, 1997 from a DNA analyst for the Virginia [Department of Forensic Science] DFS that Danial Williams was excluded as a contributor to the critical crime scene and autopsy samples, including the semen stain found on a blanket next to Michelle Bosko's body and the DNA found under Michelle Bosko's fingernails. The Commonwealth failed to disclose this highly exculpatory exclusion to Danial's lawyers until April 30, 1998, after charging Joseph Dick, Jr., and Eric Wilson, at which time they simultaneously produced for Danial Williams's attorneys Eric Wilson's confession.

> (iii) The exculpatory Econo Lodge and Tides Inn motel records that corroborated John Danser's statement that he was in Norfolk two weeks after the Bosko rape and murder, but that failed to corroborate the Commonwealth's theory that he was in Norfolk in the days before and after the crime.

> (iv) Derek Tice's exculpatory November 5, 1998, statement in which he first denied that John Danser was involved in the Bosko rape and murder, and later denied that he (Tice) was involved in any way in the crime.

> (v) Omar Ballard's letter to Karen Stover admitting he murdered Michelle Bosko and DNA results conclusively linking Ballard to the DNA from the crime scene and autopsy (until after the Commonwealth reversed course and withdrew its motion to revoke Danial Williams's plea agreement).

(b) The Commonwealth and/or its agents made misrepresentations and, in at least one instance, made false representations about the existence of material and exculpatory evidence.

> (i) The Commonwealth told Eric Wilson's defense counsel in response to repeated requests for the crime scene videotape that no crime scene videotape existed and, when it could no longer deny the videotape's existence, claimed it was not required to produce

the videotape because it was not exculpatory. When ultimately produced, the videotape was clearly exculpatory because the crime scene condition depicted in the videotape clearly contradicted the Commonwealth's multiple offender theory.

(ii) The Commonwealth falsely misrepresented to John Danser's attorney that no motel records existed relating to Danser's claim that he was in Norfolk two weeks after the Bosko crime, but not in the days before and after the assault, when Ford had actually obtained the records on November 4, 1998.

(c) The Commonwealth acted in bad faith and violated the Virginia Code of Professional Responsibility on several occasions. The Commonwealth's misconduct in this prosecution, individually and collectively, caused prejudice to Danial Williams and violated his rights to due process.

(i) The Commonwealth violated Canon 8 of the Virginia Code of Professional Responsibility, Disciplinary Rules § 8–102(A)(3) when it required that the cooperating codefendants, Joseph Dick. Jr., and Derek Tice, and their counsel not discuss with other defendants or their lawyers the terms of their plea agreements and other facts about the crime or the prosecution of which they were aware.

(d) The Commonwealth acted in bad faith when it opposed Danial Williams's motion to withdraw his guilty plea when it had just two months before sought to void that very plea agreement, then quickly reversed course without explanation on the very day it *ex parte* received evidence inculpating Ballard and exculpating Williams.

(*Id.* at 82–84.)

Claim 5    Detective Ford violated Williams's rights because Ford "engaged in pervasive police misconduct, manipulated the criminal justice system, and twisted evidence to fit his 'theory' of the crime by intentionally pursuing the prosecution of Danial Williams even though he believed the evidence did not demonstrate Danial Williams's guilt . . . ." (*Id.* at 84–85.) Williams argues that:

(a) Ford's indictment and his convictions prove that for a period of twenty years—before, during, and after the prosecution of Danial Williams in this case—Ford was willing to and did in fact manipulate the criminal justice system in his official capacity as a police officer by fabricating evidence and lying to prosecutors, defense attorneys, and judges for his personal corrupt financial gain.

(b) Before Ford's federal indictment and conviction, no actual evidence existed that Ford intentionally and in bad faith pursued charges against

6

Danial Williams and the other Navy sailors despite the fact that he believed they were innocent. While evidence existed suggesting that Ford had engaged in misconduct during the Bosko murder investigation and in other cases, the type of misconduct discovered at that time appeared to involve corner-cutting legal requirements in order to secure convictions of individuals he believed had committed crimes. The available evidence suggested that the police investigators, including Ford, and the prosecutors negligently or recklessly pursued the prosecution of Danial Williams and his innocent codefendants as a result of tunnel vision and a misguided, dogged belief in the false confessions that Ford had obtained from them.

(c) New evidence uncovered by Danial Williams in the wake of Ford's indictment corroborates Danial Williams's due process claim that Ford intentionally and in bad faith pursued charges against men he believed were innocent. A witness has indicated that Ford has expressed his belief that Danial Williams and the other members of the Norfolk Four are innocent, which directly contradicts his sworn testimony on at least one previous occasion that he believed that all eight men he charged in the Bosko murder are guilty. Another witness has indicated that Ford had possession of the police investigation file that contained a police report showing that Tamika Taylor had informed the police that Omar Ballard should be considered a suspect in Michelle Bosko's murder because Ballard had attacked a woman in the same apartment complex just a few weeks earlier. Ford ignored the Ballard tip despite DNA and other evidence strongly indicating Danial Williams was innocent. A third witness has described concerns in the police department about whether Danial Williams and the other military men charged in the case were actually guilty, yet despite these concerns, the police continued to arrest suspects in the case and left it up to the prosecutors to decide whether prosecuting those suspects was merited.

(d) Danial Williams's investigation, after Ford's federal indictment, into Ford's behavior in other homicide cases corroborates his due process claim that Ford manipulated and twisted evidence in Danial Williams case in bad faith by demonstrating that Ford engaged in a decades-long pattern of misconduct that prejudiced defendants he had arrested in homicide cases when the evidence in those cases strongly indicated the defendants were innocent. Ford's prior history, his indictment, the new evidence uncovered in its aftermath, Ford's conviction on federal corruption charges show that Ford had a double motive to pursue the prosecution of Danial Williams and manipulate evidence in bad faith despite his belief in Williams's innocence. In 1990, Ford was demoted for having coerced false confessions in the Lafayette Grill murder case from three juvenile suspects facing capital charges. Ford's demotion suggests that he had a motive to similarly manipulate and twist evidence seven years later in the Norfolk Four case in order to protect his career. Had it been revealed that Ford had once again coerced false confessions in a capital case, his police career would have been in jeopardy. Moreover, Ford's indictment and

conviction show that Ford's police career not only would have been jeopardized by the revelation that he had coerced a false confession from Danial Williams, but his profitable, corrupt, and secret scheme to extort thousands of dollars from drug defendants would have been jeopardized.

(*Id.* at 85–87.)

## II. Standard for Actual Innocence

"Claims of actual innocence, whether presented as freestanding ones, *see Herrera v. Collins*, 506 U.S. 390, 417 (1993), or merely as gateways to excuse a procedural default, *see Schlup v. Delo*, 513 U.S. 298, 317 (1995), should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (parallel citations omitted).   Here, the Court reviews Williams's assertion of innocence under the more lenient standard for gateway claims because Williams's actual innocence claim would allow the Court to consider his otherwise time-barred or procedurally defaulted constitutional claims. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013).[4]

### A.     New Evidence Requirement

A gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* "Some circuits require the petitioner to present 'newly discovered' evidence as opposed to evidence that is merely 'newly presented.'" *Lee v. Johnson*, No. 2:10cv122, 2010 WL 3937334, at *5 n.9 (E.D. Va. July

---

[4] The United States Court of Appeals for the Fourth Circuit has indicated that the limitations on conducting evidentiary hearings set forth in 28 U.S.C. § 2254(e)(2) do not apply to hearings on a petitioner's assertion of actual innocence as a gateway to evaluate otherwise barred claims. *See Teleguz v. Pearson*, 689 F.3d 322, 331 n.6 (4th Cir. 2012) (citations omitted).

28, 2010).[5] Under either definition, as pertinent here, the Court evaluates whether the evidence is "new" relative to the time he entered his guilty plea. *See Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999).

## B.    Evaluate All of the Evidence

If a petitioner meets the burden of producing new, truly reliable evidence of his innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v.*

---

[5] The distinction between "newly discovered" and "newly presented" evidence has heightened significance when little to no evidence was presented initially during the criminal proceedings because the defendant entered a guilty plea due to the allegedly deficient advice of counsel.

> In those circuits where the evidence must be newly discovered, "[a] defendant's own late-proffered testimony is not 'new' because it was available at trial [and the defendant] merely chose not to present it to the jury." *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004); *see also Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005). Other circuits require only that the evidence be newly presented, noting that "[p]articularly in a case where the underlying constitutional violation claimed is the ineffective assistance of counsel premised on a failure to present evidence, a requirement that new evidence be unknown to the defense at the time of trial would operate as a roadblock to the actual innocence gateway." *Gomez v. Jaimet*, 350 F.3d 673, 679–80 (7th Cir. 2003); *see also Prince v. Thaler*, 354 F. App'x 846, 847 (5th Cir. 2009); *Griffin v. Johnson*, 250 F.3d 956, 963 (9th Cir. 2003).

*Lee*, 2010 WL 3937334, at *5 n.9 (alterations in original). At this juncture in these proceedings, the Court will consider all evidence that is newly presented. *See Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999) ("The *Schlup* Court adopted a broad definition of 'new' evidence to be considered in such cases: a petitioner must offer 'new reliable evidence . . . that was not presented at trial.'" (quoting *Schlup*, 513 U.S. at 324) (omission in original)). The parties remain free to submit further briefing on this issue.

*Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, No. 3:09cv659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

In providing the following summary, the Court declines at this juncture to recite in minute detail every bit of evidence tending to implicate or exonerate Williams. Rather, the Court reviews the evidence with an eye to assessing whether an evidentiary hearing is warranted with respect to Williams's new evidence and his assertion of innocence.

### III.  Procedural History and Summary of the Evidence

#### A.      Initial Investigation of Michelle Bosko Murder

On July 8, 1997, William Bosko returned to his home in Norfolk from a Navy cruise. He found his wife, Michelle Bosko (hereinafter "Michelle"), murdered in the bedroom of their apartment. The police investigation quickly focused on Danial Williams, a neighbor of the Boskos. On July 9, 1997, after questioning by the police, Williams confessed to raping and stabbing Michelle. Williams's statement indicated that he acted alone in raping and murdering Michelle. Williams was charged with capital murder and rape.

Although the police progressively obtained confessions from four men, Danial Williams, Joseph Dick, Derek Tice, and Eric Wilson, who admitted to committing the crimes against Michelle Bosko, the confessions repeatedly failed to square with each other or the biological evidence recovered from the victim's person.

Jerry Sellers, a forensic scientist employed by the Commonwealth, recovered several biological samples that he deemed suitable for DNA testing: a vaginal swab from Michelle, a spermatoza stain on a white blanket that was covering Michelle's body, and material from

10

underneath Michelle's fingernails. In late December of 1997, DNA testing conclusively eliminated Williams as the source of DNA found at the crime scene. Investigators turned their attention to Williams's roommate, a fellow sailor, Joseph Dick. Dick initially denied any involvement in the crime and stated that he was on duty on board his navy ship on the date of the murder. Dick eventually admitted that he participated in raping and murdering Michelle with Williams.

On March 26, 1998, DNA testing eliminated Dick as the source of DNA found at the crime scene. After receiving information from a jailhouse informant, the investigators turned their attention to Eric Wilson. On April 8, 1998, the police interrogated Wilson. Wilson initially denied participation in the crime, but soon Wilson admitted to raping Michelle with Dick and Williams. On June 10, 1998, DNA testing eliminated Wilson as the source of the DNA found at the crime scene.

On June 16, 1998, Dick provided another statement to the police wherein he indicated another individual was involved in the rape and murder and he believed that this man was named George Clark. Dick later picked out a photograph of Tice as the man he had identified as George Clark. On June 18, 1998, Tice was arrested in Florida.

On June 25, 1998, Tice was brought to Norfolk and questioned by Detectives Ford and Ray. Tice initially denied involvement in the rape and murder. Tice, however, soon confessed to his involvement in the crime. Tice stated that he had committed the crime with Williams, Wilson, Dick, Geoffrey Farris, and Rick Pauley.

In August of 1998, however, DNA testing eliminated Tice, Farris, and Pauley as the source of the DNA found at the crime scene. Nevertheless, criminal charges were pursued against Farris and Pauley.

Tice entered into plea negotiations with the prosecutor. Tice's plea agreement required him to testify against his codefendants and identify the individual whose DNA was found at the crime scene. In exchange for this cooperation, the prosecutor agreed to drop the death penalty. As part of his plea agreement, Tice agreed to submit to further questioning by the police. On October 27, 1998, Tice provided a statement to the police wherein he identified "CJ" John Danser as the seventh participant in the rape and murder of Michelle. Tice stated that he had not named Danser earlier because he and Danser were good friends. The police then arrested Danser in conjunction with Michelle's rape and murder.

## B.    Williams's Guilty Plea

On January 22, 1999, Williams pleaded guilty to the murder and rape of Michelle. At his guilty plea hearing, Williams

> agree[d] under oath that the following is a true and accurate description of the events leading up to and including the rape and murder of Michelle Moore-Bosko in July 1997:
>
> On the evening in question, Danial Williams was in his apartment, F113, located at 254 West Bay Avenue in the city of Norfolk, in the company of Joseph Dick, Eric Wilson, Derek Tice, Richard Pauley, Jeffrey Farris and John Elmer "CJ" Danser . . . . All seven were members of a group that called themselves the "Banque Crew", because of their frequent patronage of the Banque bar on East Little Creek Road. Danser no longer lived in Norfolk, but was in town to see a friend off on a six-month Navy deployment that day, which happened to be Danser's birthday. Williams' wife, ill with cancer, was asleep in a bedroom. While at the apartment, Williams brought up his fascination with Michelle Moore-Bosko, an eighteen-year old Navy wife, who lived in apartment F-111 across the hall.
>
> Williams was obsessed with sexual desires toward Michelle Bosko, and made numerous attempts to ingratiate himself with her. His most frequent ruse to gain entry into her apartment and talk to her was to use her telephone, even though he had phone service in his own apartment. The Friday evening before the murder, Williams used the phone pretense to gain entry to Michelle's apartment while she was hosting two female friends, including a neighbor, Tamika Taylor. The women were playing music at the time, and Williams went back to his apartment and then returned with his own case of compact discs to play. As he played his music, Williams began to dance alone in a sexually suggestive manner, undulating himself on the wall, the floor, furniture, and behind Michelle. Taylor pulled Michelle, who was apparently unaware of this, away from Williams, and

then told him to leave, because Michelle was either too timid or embarrassed to do so herself.

During Williams' discussion with the other six above named co-defendants, his initial expression of his desire to see Michelle's underwear developed into a plan to sexually assault her. Williams knew that her husband was out to sea at that time, and that she would be alone. He and the other six walked across the hall to her apartment. During the course of this plan, at least one of them, Derek Tice, suggested that they could not leave her alive if they were going to through with it. They knocked on her door and covered the peephole. When Michelle cracked the door, they forced their way in and quickly overpowered her. She was forced into the bedroom of the apartment, where all seven of them vaginally raped her as she lay on the floor. Each took turns holding her down and covering her mouth while another would rape her.

A kitchen knife was produced by one of the seven, and each took turns stabbing her in the left chest. As she was stabbed, Williams strangled her. As they had done raping her, the seven defendants took turns holding her down while another stabbed her. They then left her body in the apartment, and dispersed. All of them agreed that by each stabbing her, they were all equally culpable, and they vowed not to implicate anyone else if caught. Because of this pledge, Williams did not offer anyone else's name when he was questioned and charged on July 9, 1997.

The following afternoon Michelle's husband arrived back in Norfolk. When Michelle did not meet him at the pier, as planned, William Bosko took a cab back to the apartment. At the apartment, he discovered his wife's body, unclothed from the waist down. He was unable to locate the cordless phone, which was behind a chair cushion, so he banged on the defendant's door. The defendant called the police from his phone and went into the apartment with William Bosko. Later, the defendant agreed to talk to police, and he eventually confessed to raping and killing Michelle Moore-Bosko, but he did not implicate any of the other participants.

(JA at 497–99.)

### C.     Events Following Williams's Guilty Plea

In early 1999, while serving a prison sentence for an unrelated rape and malicious wounding, Omar Ballard, a black male, wrote a letter to a friend, K.A. (*See* JA at 284-85.) Ballard demanded that K.A. send him money and lurid photographs of herself. (JA at 285.) Ballard threatened to kill her if she did not comply. (JA at 285.) Ballard volunteered that he had killed Michelle:

Remember that night I went to mommie's house and the next morning Michelle got killed guess who did that, me, ha, ha. It wasn't the first time. . . . If I was out I would have killed that bitch down the street from you too . . . .

13

(JA at 284 (capitalization corrected).)  On or about February 22, 1999, the police received a copy of the above letter.  Detectives Ford and Peterson then questioned Ballard about his involvement in the murder and rape of Michelle.  Ballard told them to bring some proof of his involvement before he would talk to them.

On March 4, 1999, the Commonwealth's forensic lab informed Detective Ford that Ballard's DNA matched DNA recovered from the scene of Michelle's murder.  On March 11, 1999, upon questioning by Detectives Ford and Peterson, Ballard admitted that he had raped and stabbed Michelle. Ballard denied that any other individuals were involved in the rape and murder.

On April 14, 1999, Williams filed a motion to withdraw his guilty plea.  On April 21, 1999, Dick pled guilty to the murder and rape of Michelle.

On April 28, 1999, the Circuit Court conducted a hearing on Williams's motion to withdraw his guilty plea and denied the motion.[6]  Thereafter, the Circuit Court sentenced Williams to life in prison without the possibility of parole.

On May 7, 1999, Tice rejected his plea agreement.  Shortly thereafter, the prosecutor dropped the charges against Danser, Pauley, and Farris.  In June of 1999, a jury found Wilson guilty of rape and acquitted him of the murder Michelle.

On February 14, 2000, a jury found Tice guilty of the rape and capital murder of Michelle.  Tice was sentenced to life in prison.

On March 15, 2000, Ballard met with Detectives Glenn Ford and D.M. Peterson and made a statement.  Ballard stated that he had committed the rape and murder of Michelle with

---

[6] Counsel did not call Williams to testify at this hearing.

Williams, Dick, Tice, and Wilson.  On March 22, 2000, pursuant to a plea agreement, Ballard pled guilty to the rape and murder of Michelle.

On May 21, 2002, the Court of Appeals of Virginia found that the jury had been improperly instructed and reversed Tice's convictions for capital murder and rape. *Tice v. Commonwealth*, 563 S.E. 2d 412 (Va. Ct. App. 2002).

Following a second jury trial in January of 2003, after two days of deliberation, Tice again was found guilty of rape and capital murder.

On August 6, 2009, Governor Timothy Kaine granted Williams, Dick and Tice conditional pardons, because they "'had raised substantial doubts about the validity of their convictions but had not conclusively established their innocence.'" *Wilson v. Flaherty*, 689 F.3d 332, 334 (4th Cir. 2012).

### IV. Williams's Arguably New Reliable Evidence

As described below, Williams has produced some arguably new and reliable evidence of his innocence.  As previously explained, the evidence is new in relation to the evidence that was presented at the time of Williams's guilty plea on January 22, 1999.  Some of the evidence described below was produced during the trials of Williams's codefendants over a decade ago or during Williams's clemency proceedings.

### A. DNA Tests that Reflect that Omar Ballard's and Only Omar Ballard's DNA Was Recovered from the Victim's Person and the Crime Scene

During his guilty plea, Williams admitted to the prosecution theory that he had raped Michelle Bosko with Joseph Dick, Eric Wilson, Derek Tice, Richard Pauley, Jeffrey Farris and John Elmer "CJ" Danser.  Shortly after Williams's guilty plea, DNA testing identified Omar Ballard as the contributor of the spermatoza stain on a white blanket that was covering Michelle Bosko's body.   (Am. § 2254 Pet. Index of Documents Ex. 27, ECF No. 34–28.)  Thereafter, DNA testing identified Omar Ballard as the male contributor for biological material that was

under Michelle Bosko's fingernail and for the material on a vaginal swab from her. (JA 2062–2084.)

In these federal habeas proceedings, Williams has submitted the December 21, 2005, Affidavit of Todd W. Bille,[7] the Director of Special Projects at the Bode Technology Group. (Am. § 2254 Pet. Index of Documents Ex. 23, at 1.) After reviewing a substantial amount of the record material regarding the rape and murder of Michelle Bosko, Bille swears that the evidence "suggest[s] that there was only one perpetrator of the crime, Omar Ballard . . . ." (*Id.* at 4.) Bille further swears that "the absence of any DNA connecting Danial Williams, Joseph Dick, Derek Tice or Eric Wilson to the crime scene makes it overwhelmingly likely that these four men did not participate in the rape and murder of Ms. Bosko." (*Id.*)

## B.  Expert Analysis of the Autopsy of Michelle Bosko

At Derek Tice's second trial in January of 2003, Dr. Kinnison testified for the prosecution. This Court previously observed that "significant questions [existed] as to how the medical evidence squared with the prosecution's theory that seven or eight men had taken turns stabbing Michelle." *Tice v. Johnson*, No. 3:08CV69, 2009 WL 2947380, at *19 (E.D. Va. Sept. 14, 2009) (footnote omitted). The Court then noted:

> Dr. Kinnison acknowledged that the three fatal wounds to the chest cavity were closely grouped, entered in the same general direction and were "virtually identical" in depth. (Jan. 28, 2003 Tr. 36.) Dr. Kinnison further acknowledged that "the strangulation and the stab wounds could have been caused by one individual." (Jan. 28, 2003 Tr. 39.) Throughout her testimony, Dr. Kinnison was reluctant to offer an opinion as to whether the medical evidence was more consistent with an attack by a single individual rather than by multiple individuals. Nevertheless, she acknowledged that, on July 9, 1997, when she conducted Michelle's autopsy, consistent with the then prevailing police theory, her impression was that the crime was committed by a single individual.

*Id.*

---

[7] Bille has "qualified as an expert in state and federal courts on DNA and serology analysis more than seventy times." (Am. § 2254 Pet. Index of Documents Ex. 23, at 1.)

Additionally, Williams has presented the November 8, 2005 declaration of Dr. Werner U. Spitz, a highly respected, board certified forensic pathologist. (Resp. Mot. Dismiss Ex. 9, ECF No. 21–9.) Dr. Spitz concluded:

> After evaluating all of the evidence, it is my opinion that the injuries on Ms. Bosko's neck, left side of her chest, and genital injuries are all consistent with a single offender and inconsistent with multiple offenders. From a forensic pathology perspective, the entire record in this matter is wholly inconsistent with a conclusion that multiple offenders raped and murdered Ms. Bosko. It is my opinion that the entirety of the injuries and the circumstances at the scene indicate to a reasonable degree of certainty that a single assailant raped and murdered Michelle Moore Bosko.

(*Id.* at 7.)

### C. Larry E. McCann's Crime Scene Analysis and Reconstruction Report of the Sexual Assault and Murder of Michelle Moore-Bosko[8]

In his November 3, 2005 report, McCann offers detailed and compelling support for his conclusion that "Ballard sexually assaulted and murdered the victim by himself" and that "Williams, Dick, Wilson, and Tice had nothing to do with this crime." (JA at 3718.)

### D. Alibi Evidence for Richard Pauley and John Danser

During his guilty plea, Williams stated that he raped and murdered Michelle with Pauley and Danser. During Derek Tice's second trial, the defense presented convincing testimonial and documentary evidence that neither Pauley nor Danser was present on the night of the crimes. (JA at 3074–3104, 3110–35, 3640–54, 4319, 4589–90, 4593–98.)

### E. Williams's Recantation of the Stipulation of Facts from His Guilty Plea and Other Evidence that Corroborates Williams's Assertion of Innocence

In his affidavit, dated January 27, 2010, Williams swears that he told his attorneys Danny Shipley and Robert Frank, that "I did not have anything to do with Michelle's death and that I was home in bed with Nicole when the police said Michelle was murdered." (Am. § 2254 Pet. Index of Documents Ex. 2 ¶ 23.) Thereafter, Williams told his attorneys that "I did not want to

---

[8] (JA at 3672–3631.)

plead guilty because I did not kill Michelle." (*Id.* ¶ 28.)   Williams further represents, after Joseph Dick and then Eric Wilson were charged, Danny Shipley came to see him and asked him why he had not told Shipley about Dick's and Wilson's involvement. (*Id.* ¶¶ 30, 33.)   On each occasion, Williams stated something to the effect of, "'Mr. Shipley, how could I tell you that someone else was involved when I wasn't there.'" (*Id.* ¶ 30; *see* ¶ 33.)   Williams insists that his attorneys "pushed me really hard to take the plea and put enormous pressure on me, and I finally gave in and agreed to plead guilty to a crime I did not commit." (*Id.* ¶ 34.)   Williams continues, "I am innocent and did not want to plead guilty, I felt I had no choice because my alibi witness had died and my lawyers were not prepared to fight the charges . . . I only pled guilty to avoid the death penalty." (*Id.* ¶ 37.)[9]

In his December 3, 2009 affidavit, Danny Shipley largely confirms Williams's account of their interactions. (*See* Am. § 2254 Pet. Index of Documents Ex. 16.)   Shipley states,

> During the entire time that I represented him, Danial Williams always maintained that he was innocent of the charges against him and denied that he was involved in any way in the rape and murder of Michelle Bosko.   At no time during my representation of Danial Williams did he ever say that he had any knowledge about this crime nor did ever say that he had information about any other person's involvement in this crime.

(*Id.* ¶ 4.)

> Ms. Williams appeared very ill to me when I met her.   Either she or Danial Williams told me that she suffered from ovarian cancer.   I also knew early on in my representation of Danial Williams, before Nicole Williams died, that she corroborated Danial Williams' claim that he was home in bed with her on the night that Michelle Bosko died.   Neither I nor my co-counsel, Robert Frank, ever took steps to preserve Nicole Williams' testimony corroborating her husband's alibi, either by taking her deposition, having her sign an affidavit, or preserving testimony in some other way; [w]e just never considered doing so.   We had no strategic reason for not preserving Nicole Williams' testimony, and it would have made sense to do so given her condition.

---

[9] Nicole Williams had confirmed to the police that Danial Williams was in bed with her on the night of Michelle's murder. (JA at 435.)

> After receiving the initial discovery from the Commonwealth in Danial Williams' case, I understood that the evidence against Danial Williams consisted of his confession and reports from friends or relatives of Michelle Bosko that Danial Williams seemed attracted to her.   At this point, I believed Danial Williams was probably guilty of this crime.  Neither I nor my co-counsel, Robert Frank, ever took steps to investigate the Commonwealth's evidence against Danial Williams or to investigate evidence that corroborated his statements to us that he did not commit the crime.  We did not interview any witnesses nor did we retain an investigator to interview witnesses, visit the crime scene, or otherwise investigate the facts of Danial Williams' case.  We did not have a strategic reason for not investigating Danial Williams' case.

(*Id.* ¶¶ 12–13 (paragraph number omitted).)

Additionally, Shipley confirms that, after Joe Dick and Eric Wilson confessed to their involvement in the crimes against Michelle Bosko, Shipley asked Williams why he had not provided Shipley with information about Dick and Wilson.   (*Id.* ¶¶ 20, 22.)  With respect to Dick, Williams responded, "'Mr. Shipley, how could I tell you his name, I wasn't there?'" (*Id.* ¶ 20.)  With respect to Wilson, Williams responded, "'Mr. Shipley, how could I tell you about Wilson? I wasn't there.'"  (*Id.* ¶ 22.)

Furthermore, Shipley acknowledges,

> We put a lot of pressure on Danial Williams to accept the Commonwealth's plea offer.  I told Danial Williams that juries in Virginia were unlikely to believe that a person would confess to a crime unless he was guilty, and that Danial Williams was likely to be convicted at trial simply on his confession alone. . . .   I also told Danial Williams that if he was convicted, he would very likely be sentenced to death.  I told Danial Williams that Virginia is very efficient about executing inmates sentenced to death . . . . I told Danial Williams that I did not believe that we could persuade twelve jurors that he was not guilty and that the best we could hope for was to get a hung jury, in which case the Commonwealth would likely try him again.  In sum, I described to Danial Williams, in the worst possible way, his prospects for prevailing at trial.

(*Id.* ¶ 25.)

19

**F.      Joe Dick's Recantation of His Involvement in the Rape and Murder of Michelle Bosko and Evidence that Tends to Corroborate that Recantation**

.          In a declaration executed on July 2, 2010, Dick swears that he "had no involvement in the rape and murder of Ms. Moore-Bosko. . . . In addition, any statements I made implicating Danial Williams, Derek Tice, or Eric Wilson in the Ms. Moore-Bosko's rape and murder are completely false." (Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, Declaration of Joseph Jesse Dick, Jr. ¶ 41, *Dick v. Muse*, 3:10CV505, ECF No. 1–3 (E.D. Va. filed July 23, 2010). The Court acknowledges that, given the different statements that Dick has provided over the years about the crimes against Michelle, standing alone, his current recantation is not reliable. *See Tice v. Johnson*, No. 3:08CV69, 2009 WL 2947380, at *21 (E.D. Va. Sept. 14, 2009) ("Confronted with the history of the meandering development of Dick's account of the crime and Dick's expressed willingness to tell the police anything they wanted [to] hear, a juror would have significant questions about the veracity of Dick's testimony.") Nevertheless, Dick's recantation is corroborated by Senior Chief Ziegler's testimony that, on the night of Michelle's murder, Dick was on duty on board the ship *Saipan* (JA at 3521–35), and the absence of any indication that, in their initial questioning by police, either Danial or Nicole Williams indicated Dick was present in their apartment on the night of the murder.

**G.      Omar Ballard's Initial Statements to the Police Indicating that He Committed the Crimes Alone and His Most Recent Statements Indicating that He Committed the Crimes Alone**

In a March 4, 2009 statement to police, Ballard admitted that he alone had murdered Michelle Bosko. (JA at 286–290.) Many of the details of Ballard's March 4, 2009 statement align with the physical evidence of the crime. (*See* JA 3697–98.)

In a March 11, 2009 statement, Ballard admitted that he alone raped and murdered Michelle. (JA at 296–305.) Once again, many of the details of Ballard's statement align with the physical evidence. (*See* JA at 3698.)

In September of 2006, during the course of an evidentiary hearing for Derek Tice's state habeas proceeding, Ballard testified that he alone raped and murdered Michelle Bosko. (JA at 3474–75.)

Considered collectively, at this juncture, the Court concludes that Williams has supported his claim of innocence with sufficient evidence of the requisite reliability to proceed to the second step of the actual innocence inquiry.

### V. Evaluation of All of the Evidence

Under the next step the Court evaluates "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)). In this regard, the Court directed the parties to prepare a Joint Appendix necessary for resolution of Respondent's procedural defenses and Williams's assertion of actual innocence as a basis for overcoming such defenses. (ECF No. 42.) The Court has reviewed the Joint Appendix, and the additional audio visual exhibits included with the Joint Appendix. As explained below, the Court concludes an evidentiary hearing is warranted.

As was the case with Derek Tice and Eric Wilson, Danial Williams's confession was the linchpin of the prosecution's case that he participated in the crimes against Michelle Bosko. Judge Williams provided the following summary of that evidence against Derek Tice which applies with equal force to Williams:

> There was no physical evidence linking [Williams] to the crimes or suggesting that [Williams] acted in concert with the individual[ ] who had committed the crimes. Indeed, the physical evidence tended to refute the theory that the rape and murder had been committed by multiple individuals. Although the prosecution alleged that eight men had crowded into the bedroom to rape Michelle, and then took turns stabbing her, there was remarkably little sign of

21

> such violent activity by so many men in such a confined space. Furthermore, the wounds to Michelle did not indicate that she had been the victim of serial stabbing by seven or eight different individuals. Additionally, while multiple DNA deposits were found at the crime scene, they were traced only to one individual, Omar Ballard.

*Tice v. Johnson*, No. 3:08CV69, 2009 WL 2947380, at *22 (E.D. Va. Sept. 14, 2009), *aff'd*, 647 F.3d 87 (4th Cir. 2011).[10]   Additionally, a reasonable juror would also have to consider Dick's prior testimony that Williams participated in the rape and murder of Michelle Bosko.   However, Dick's testimony was hardly compelling.

> Considering the variety of accounts Dick had provided and the lack of any significant corroboration of his testimony that [Williams] had participated in the crime, a reasonable juror would have grave doubts as to Dick's veracity regarding [Williams's] participation in the crime. Any confidence in Dick's testimony that [Williams] participated in the crimes would be further shaken by the defense evidence that indicated that Dick had falsely implicated Danser and Pauley in the commission of the crimes.

*Id.* at *23.

Relatedly, one has to consider Tice's and Wilson's prior statements implicating Williams in the crimes against Michelle Bosko.  Those statements, however, often failed to square with the physical evidence of the crimes.  (*See* JA at 3705–10.)

Of course, Williams's prior admissions[11] to his participation in the crimes against Michelle remain a significant hurdle to demonstrating "'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28).   Additionally, Williams's obsession with Michelle in the days preceding her demise and Dick's bizarre letters

---

[10] Moreover, upon reviewing evidence similar to that presented here, Judge Wynn concluded that Eric Wilson "is almost certainly innocent" of the rape of Michelle Bosko. *Wilson v. Flaherty*, 689 F.3d 332, 341 (4th Cir. 2012) (Wynn, J., dissenting).

[11] Williams's description of the crimes, however, also failed to square with the physical evidence in several significant aspects. (JA at 3699–3700.)

to Nicole Williams, admitting to his involvement with Danial Williams in the crimes against Michelle[12] support the prosecution's case that Williams and Dick raped and murdered Michelle.

Nevertheless, the only witnesses who directly implicated Williams in the rape and murder of Michelle Bosko—Williams, Dick, Tice, Wilson, and Ballard—have now recanted or retracted those accusations. If credited, these recantations could establish Williams's assertion of his actual innocence. Under similar circumstances, the United States Court of Appeals for the Fourth Circuit has indicated an evidentiary hearing may be appropriate. *See Teleguz v. Pearson*, 689 F.3d 322, 331–32 (4th Cir. 2012) (remanding to the district court for an assessment on conducting an evidentiary hearing where two of the prosecution's three critical witnesses recanted their trial testimony); *Teleguz v. Pearson*, No. 7:10CV00254, 2012 WL 6151984, at *3 (W.D. Va. Dec. 11, 2012) (concluding that "[l]ive testimony, subject to cross examination and questions from the court, is in my opinion necessary to determine the accuracy and reliability of the claim of innocence"). Furthermore, as the merits of Williams's assertion of innocence were not resolved in his state habeas proceeding, *see Townsend v. Sain*, 372 U.S. 293, 313 (1963), this Court will conduct an evidentiary hearing on Williams's gateway claim of actual innocence.

---

[12] For example, in one letter, Dick tells Nicole the story he wants her to repeat about his, Williams's and Wilson's roles in the rape and murder of Michelle. (JA at 192.) Dick then states to Nicole:

> Nicole, you know that I love you and I know that you love me. I'm going to tell you some thing [sic] and I'm being straight up with you. If my DNA is found to be positive all that happened was Michelle was forced by knife point to give me a blowjob. I don't want you to get all pissed off at me for this but that is what happen [sic].

(*Id.*)

The Court will issue a separate scheduling and briefing order for conducting the evidentiary hearing.

An appropriate Order shall issue.

Date: 6/27/14
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge